Ms. Virginia Wetherell Secretary, Department of Environmental Protection 3900 Commonwealth Boulevard Tallahassee, Florida 32399-3000
Dear Secretary Wetherell:
You ask the following question:
Must the Department of Environmental Protection obtain a permit from the St. Johns River Water Management District prior to altering the schedule of lockages through the Buckman Lock?
In sum:
The Department of Environmental Protection is not required to obtain a permit from the St. Johns River Water Management District prior to altering the schedule of lockages through the Buckman Lock.
You have advised this office that the Buckman Lock (Lock), a navigation lock constructed as part of the Cross-Florida Barge Canal, has been in operation since December 14, 1968. The Lock links navigation between the St. Johns River and the Rodman Reservoir. Prior to September 30, 1993, the Lock was operated by the U.S. Army Corps of Engineers; however, following the deauthorization of the Cross-Florida Barge Canal Project and the transfer of lands and interests back to the state, the Lock was operated by the St. Johns River Water Management District (district). The Department of Environmental Protection (department) assumed control over the Lock on September 30, 1994, and has operated the Lock since that time. Through September 1994, the Lock was open to the public seven days a week from 7:00 a.m. until 4:30 p.m., except for limited closings for necessary repairs or scheduled maintenance.
You state that in recent months, the department has found it necessary, for protection of manatees and for economic concerns, to modify the time schedule for providing the public with lockages through the Lock. The district has raised the question of whether a change in the lockage schedule requires the department to seek a district permit.
Part IV, Chapter 373, Florida Statutes, governs the management and storage of surface waters in this state. Section 373.413(1), Florida Statutes, provides:
"Except for the exemptions set forth herein, the governing board [of a water management district] or the department may require such permits and impose such reasonable conditions as are necessary to assure that the construction or alteration of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works will comply with the provisions of this part and applicable rules promulgated thereto and will not be harmful to the water resources of the district. The department or the governing board may delineate areas within the district wherein permits may be required."[1]
Section 373.406(5), Florida Statutes (1996 Supplement), provides that the department or a water management district may, by rule, establish general permits for stormwater management systems and may also establish exemptions.[2] Both the department and the district have referred to Rule 40C-4.051, Florida Administrative Code, which provides:
"(2) Specifically exempted from permitting under this chapter for the purpose of construction, operation, and maintenance are:
(a) Each system or phase of a phased system which is located in the areas described in Rule 40C-4.031(1)(a) and (b), F.A.C., except agricultural operations, which:
* * *
2. Was not required to obtain a permit prior to December 7, 1983, and was:
a. Constructed and operating prior to December 7, 1983. . . .
* * *
(c) The exemptions listed in subsections (2)(a) and (b) above apply only to those systems or phases of a phased system as such systems are set forth in its plans, specifications and performance criteria prepared and existing as of (effective date) and to the extent:
1. Construction of such system is completed, within the applicable time frames, in accordance with such plans, specifications and performance criteria; and
2. Such system is maintained and operated in a manner consistent with such plans, specifications and performance criteria.
* * *
(4) Those systems or phases of a phased system exempted by subsection (2) above shall not be required to obtain a permit for construction, operation or maintenance."
Thus the rule exempts those systems that were in operation prior to December 7, 1983, provided that they are maintained and operated in a manner consistent with the system's plans, specifications, and performance criteria.
The district suggests that a variation in the hours of operation constitutes a change in the system's plans, specifications or performance criteria. Accordingly, it is the district's position that the operating hours may not be altered without district permit review.
A review of the March 1968 Operation and Maintenance Manual for the Cross-Florida Barge Canal, however, indicates that the hours of operation are not addressed therein. The manual instead contains procedures for lockages, the dewatering of the lock chamber, and the operation and maintenance of each system within the Lock complex. Thus, while the manual details how the Lock should be operated, it does not specify a schedule of lockages.
While nothing in the rule limits the district to an examination of the 1968 manual, the plain language of the exemption restricts its application to an examination of the Lock's plans, specifications, and performance criteria. In interpreting rules, words should be given their plain and ordinary meaning.[3] This office has not been provided with any written document purporting to represent a plan, specification or performance criteria for the maintenance and operation of the Lock that specifies hours of operation. Moreover, this office cannot conclude that the current posting of a sign in a public recreation area adjacent to the Lock would constitute such a "plan, specification or performance criteria." Nor do previous hours of operation or testimony regarding past operation of the Lock necessarily evidence a plan, specification or performance criteria. The references to a plan, specification and performance criteria appear to relate to how the Lock should be operated rather than when it should be operated.
Under the rule, the Lock must have been constructed prior to December 7, 1983, "in accordance with such plans, specifications and performance criteria" and must continue to be maintained and operated in a manner consistent with them. Since the rule clearly contemplates that the Lock be constructed in accordance with the plans, specifications and performance criteria, historical operating hours of the Lock which did not come into existence until after the Lock was constructed and in operation cannot constitute part of the Lock's "plans, specifications and performance criteria."
The district has expressed concern that an interpretation relieving the department of the need to obtain a permit to alter the Lock's hours of operation will allow other systems such as pump stations, gated spillways, and water control structures to be altered without the requirement of obtaining a permit. The examples given relate to systems or structures that significantly alter water levels and hydrological function as well as potentially impacting water quality. Unlike these systems, however, the operation of the Lock is not a method to regulate the surface water levels or quality. As the district itself recognizes, the "sole function of navigation locks such as the Buckman Lock is to provide a navigation connection between waters that are at different elevations." This office has been advised that changing the Lock schedule will neither affect water levels nor water quality in either the Rodman Reservoir or the downstream receiving waters.
Moreover, Chapter 373, Florida Statutes, clearly authorizes the department the power to grant exemptions. The Legislature, in setting forth the policy of the state regarding water resources acknowledges the authority of the department in this area, stating in section 373.016, Florida Statutes, that the department is vested with
"the power and responsibility to accomplish the conservation, protection, management, and control of the waters of the state . . . . The department may exercise any power herein authorized to be exercised by a water management district. . . ."
While the statutes recognize that the department will exercise much of its authority through a delegation to the water management districts, I cannot conclude that the statutes contemplate that such a delegation necessarily subjects the department itself to the regulatory authority of the district to the extent that the department may be required to obtain a permit from the district for altering the hours of operation of the Lock.[4]
Accordingly, I am of the opinion that the Department of Environmental Protection is not required to obtain a permit from the St. Johns River Water Management District prior to altering the schedule of lockages through the Buckman Lock.
Sincerely,
Robert A. Butterworth Attorney General
RAB/all
[1] The department has supplied this office with an operating agreement between the district and the department specifying that the district shall review and take final action on all applications for permits, petitions for variances, and petitions for formal determination under Part IV, Ch. 373, Fla. Stat., and, among others, Ch. 40C-4, F.A.C., except those identified as the department's responsibility under the operating agreement. Operating Agreement Concerning Regulation Under Part IV, Chapter 373, Fla. Stat., between St. Johns River Water Management District and Department of Environmental Protection, dated August 25, 1994.
[2] See, s. 373.416, Fla. Stat., authorizing the department and a water management district to require permits for the "operation or maintenance of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works[.]"
[3] Boca Raton Artificial Kidney Center, Inc. v. Department ofHealth and Rehabilitative Services, 493 So.2d 1055, 1057 (Fla. 1st DCA 1986); Gar-Con Development, Inc. v. Department ofEnvironmental Regulation, 468 So.2d 413, 415 (Fla. 1st DCA 1985).See, e.g., Webster's Third New International Dictionary (unabridged ed. 1981), defining "plan" at p. 1729 (a schematic table or program of related parts or items, an orderly arrangement of parts in terms of an overall design or orderly objective) and "specification" at p. 2187 (a detailed, precise, explicit presentation [as by enumeration, description, or working drawing], of something or a plan or proposal for something; a written statement containing a minute description or enumeration of particulars).
[4] Cf., Att'y Gen. Fla. 75-170 (1975) (ordinarily the state and its agencies are not to be considered within the purview of a statute unless the intention to include them is clearly manifest either by being expressly named or by necessary implication);Duval County v. Charleston Lumber Manufacturing Company,33 So. 531 (Fla. 1903); United States v. Mayo, 47 F. Supp. 552 (N.D.Fla. 1942), affirmed, 319 U.S. 441 (1943), rehearing denied,320 U.S. 810 (1943) (words of a statute do not include the government or affect its rights unless the construction is clear and undisputable upon the text of the act).